UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTT D. RODRIGUEZ,

    Petitioner,

v.                                              Case No. 8:04-cv-2168-T-23MSS

SECRETARY, Department of Corrections,

    Respondent.
_____/

## **O R D E R**

Rodriguez petitions for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) and challenges his 1995 conviction for "DUI Manslaughter," for which he was sentenced to seven years imprisonment and eight years probation.[1] The response (Doc. 14), which is supported by numerous exhibits ("Respondent's Exhibit"), contends that the petition is time-barred. Rodriguez admits that the petition is time-barred, but argues that "cause and prejudice" and "actual innocence" permit review of the merits of his claims.

## **FACTS**[2]

> [O]n or about January 5th of 1994 the Defendant was driving or was in actual physical control of a red Ford Mustang on Cortez Road West at the intersection of Cape Vista Drive, approximately. At the time he was under the influence of alcohol to the extent that his normal faculties were impaired or he had a blood level above a .08 . . . it came back to a .10.

---

[1] Rodriguez was released from prison in 1999, but received a new term of imprisonment in 2002 when his probation was revoked.

[2] This summary of the facts derives from the factual statement proffered during Rodriguez's plea hearing (Respondent's Exhibit 1 at 10-11).

> His impact caused the death of Carrie Gargano. In the car was the driver, the right front seat passenger was Hiram Kemp and Carrie Gargano sat in the [rear] seat. He attempted to change lanes into the outside lane, which resulted in the vehicle striking the curb on the shoulder, causing the vehicle to leave the roadway, striking a pole on the south shoulder and overturning and coming to a final rest. The brunt of the impact against the pole was to the right rear seat position, where the decedent, Carrie Gargano, was seated.

## SCHLUP'S "GATEWAY" PROVISION

Rodriguez admits on page seventeen of his federal petition that this action is untimely. Rodriguez argues that "newly discovered evidence" and "actual innocence" permit review of the merits of his claims based on Schlup v. Delo, 513 U.S. 298 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House v. Bell, ___ U.S. ___, 126 S.Ct. 2064, 2076-77 (1996), quoting Schlup v. Delo, 513 U.S. at 327.

Rodriguez presents this court with the same "newly discovered evidence" and "actual innocence" arguments[3] that he presented to the state court. The state court rejected Rodriguez's arguments and found that the proffered evidence was neither "newly discovered evidence" nor proof of "actual innocence" because Rodriguez either knew about each fact or could have timely discovered each fact within the time for filing his direct appeal or the earlier motion for post-conviction relief.

Rodriguez has the burden of overcoming a state court factual determination by clear and convincing evidence. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting

---

[3] See petition at 18-39 (Doc. 1).

the presumption of correctness by clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1).  This presumption of correctness applies only to a finding of fact, not a

mixed determination of law and fact.  Parker v. Head, 244 F.3d 831, 836 (11th Cir.),

cert. denied, 534 U.S. 1046 (2001).  Consequently, this court must defer to the finding

of fact in the trial court's rejection of Rodriguez's claim of newly discovered evidence

(Order Denying Motion for Post-Conviction Relief at 7-14, Respondent's Exhibit 17).[4]

> Defendant contends he has new evidence to support his innocence, which he maintains he has proclaimed from the beginning of this case, although it was not until his probation was revoked and he was re-sentenced to prison that he enlisted the assistance of his family and they "launched an investigation on the D.U.I. Manslaughter."
>
> In order to qualify as newly discovered evidence, the defendant must show: (1) facts that were unknown by the trial court, defendant, or counsel at trial; (2) defendant or his counsel could not have discovered these facts by the use of due diligence; and (3) that the evidence is of such a nature that it would probably produce an acquittal on retrial.  *See Jones v. State*, 709 So.2d 512 (Fla. 1998).  In addition, because he entered a plea, the defendant must meet the threshold set forth in *Scott v. State*, 629 So.2d 888 (Fla. 4th DCA 1993), "that withdrawal of a plea may only be permitted to prevent a manifest injustice."  *Daniel v. State*, 740 So.2d 1179, 1180 (Fla. 2d DCA 1999).
>
> In this case, the Court gleans six (6) allegations of newly discovered evidence from the defendant's Motion and Memorandum of Law, five of which deal with the blood drawn from Hiram Kemp, a passenger in the vehicle the defendant was driving.  These allegations are addressed in turn below.
>
> **Hiram Kemp's blood was tested for alcohol content:** Defendant contends that his investigator . . . was told [by the FDLE Crime Lab] that Hiram Kemp's blood was tested . . . and the results were "0" ethyl alcohol.  Defendant contends this differs from his counsel's testimony at the hearing on his initial motion to withdraw plea, when someone at FDLE

---

[4] The following is a lengthy quotation of the state court's opinion because the state court thoroughly addressed each factual basis for Rodriguez's claim of "newly discovered evidence" and "actual innocence."

informed him that Hiram Kemp's blood was never tested.  Defendant contends this is important because counsel was exploring a theory that the blood samples of Kemp and the defendant might have been mixed up.

The Court rejects this claim.  First, the purported "0" ethyl alcohol result of Hiram Kemp could have been discovered by the defendant or his counsel by the exercise of due diligence, beginning with the date of the accident . . . up until the date the defendant was sentenced . . . a period exceeding twenty months.  Second . . . the defendant's "mixed-up" blood sample theory is misplaced because the defendant admitted to his own attorney that he drank at least one quart of beer on the night in question.  This admission is part of the record at the defendant's plea hearing . . . .[5]

That being the case, the defendant's blood alcohol content could not have been a "0" on the night in question.  Moreover, the defendant's lab results from Blake Medical Center reveal a blood alcohol level of .13 GM/DL after the accident.  Even the testing results from the expert retained by the defendant revealed blood alcohol levels of 60 MG/DL and 54 MG/DL.  These results clearly dispel the defendant's "mixed-up" blood sample theory.

Finally, but most important, although the defendant now contends that the FDLE tested Hiram Kemp's blood alcohol, the FDLE report indicates that the blood was tested only for the presence of certain drugs, not for alcohol.  Moreover, contrary to the defendant's assertions, the affidavit from his investigator . . . does not support his claim that Kemp's blood alcohol level was "0." . . .

Quite simply, the defendant has failed to show that withdrawal of his plea on the basis of this asserted new evidence is necessary to prevent a manifest injustice, nor has he shown that the advice given by the FDLE to his counsel originally was erroneous, *i.e.*, Kemp's blood was not tested for alcohol. . . .

**No chain of custody for Hiram Kemp's blood sample:** Defendant contends that the Florida rules of evidence "stipulate a chain of custody must be documented by every person who handles the evidence." Defendant contends that this Court should question the lack of diligence in the way FDLE handled the blood specimen in question.

---

[5] Rodriguez admits in his petition that the quart of beer he drank, which had a higher alcohol content than "regular" beer, "was probably closer to 4½ to 5 beers at the most as far as alcohol equivalency is concerned."  Petition at 28 (as numbered by Rodriguez) at 33 (as imaged) (Doc. 1).

- 4 -

> The defendant's assertion that this constitutes new evidence is rejected for three reasons. First and foremost, the defendant's contention is completely inaccurate. Attached to the State's Response, as Appendix "L," is a Chain of Custody, showing the custody of Kemp's blood sample until it was sent off to the FDLE crime lab for testing. Second, the State's Appendix "L" was turned over to defendant's counsel as part of the required discovery materials in response to the defendant's demand for discovery. . . . Thus, the defendant or his counsel knew or should have known of any chain of custody issues prior to entering his plea. . . .
>
> . . . .
>
> **No implied consent waiver form executed by Hiram Kemp:** Defendant contends that his investigator requested a copy of the "Implied Consent Waiver signed by Hiram Kemp for certification of the blood draw." According to the defendant, his investigator was informed that no such form exists, although he claims one is required under Florida law. Per the defendant's investigator, she spoke with Debra Worley, a hospital administrator at Blake Medical Center, who allegedly stated that hospital protocol "prohibits blood draws for FDLE unless there is an Implied Consent Waiver signed by the patient." Additionally, the defendant claims that in Worley's opinion, "NO blood was ever withdrawn without the signed consent form."
>
> . . . .
>
> Again, the defendant's allegation that this constitutes new evidence is rejected for two reasons. First, the defendant's recitation in his Motion of what Ms. Worley allegedly told his investigator is hearsay, and inaccurate hearsay, at that. Ms. Anderson's unsigned and unsworn affidavit neither mentions anything about an implied consent form, nor does it reflect that Ms. Worley ever stated that hospital staff would not draw a blood alcohol without an implied consent waiver.
>
> Moreover, it is ludicrous to believe that emergency room staff would not reflect a blood draw from a patient at the request of a law enforcement officer somewhere on the patient's written record. In fact, Kemp's emergency room record . . . contains the notation, "0035 – Legal blood ETOH drawn *per protocol*, specimen given to Officer Pyne." Thus, it would appear that protocol was followed in this case.
>
> Second, as pointed out by the State, Kemp was a passenger in the defendant's vehicle at the time of the crash. Therefore, the implied consent law is irrelevant to Kemp's blood draw.   . . .

- 5 -

All of these facts were known at the time the defendant entered his plea. For purposes of this motion, the defendant has failed to demonstrate that any of this evidence is newly discovered or that it would have led to a different result in his case.

**Hiram Kemp's blood was drawn by Gail Gargano:** Defendant contends that Hiram Kemp's blood was drawn by Gail Gargano, a registered nurse at Blake Medical Center . . . despite the fact that Kemp's medical records demonstrate that Kemp refused all medical treatment and would not sign any documents.[1] Even more interesting, contends the defendant, is the fact that Gail Gargano, R.N., was the aunt of Carrie Gargano, the passenger killed in the accident in which the defendant was driving. Again, the defendant contends that had this information been known "there surely would have been a different outcome at the Plea Hearing."

> [1] This allegation is also inaccurate. Kemp did not refuse all treatment. Kemp's medical records . . . reveal that he arrived in the emergency room at 11:04 p.m., was examined, x-rays were taken, and Toradol was administered. Records further reveal that upon being told that Carrie Gargano had been killed in the accident, he became tearful, then angry, refused further treatment and refused to sign the Release for Leaving Hospital Against Medical Advice. The AMA Release bears a time of 0035 (12:35 a.m.).

. . . .

First, the defendant has shown *no* demonstrable conflict of interest. He has not shown that Nurse Gargano knew who Kemp was and what, if any, relation he had to her niece on the night in question. Second, the name of Gail Gargano, R.N., along with all medical records from both Blake Medical Center and Sarasota Memorial Hospital, was provided by the state to the defendant in a discovery response . . . . It is therefore apparent that defendant's counsel had Gargano's name as early as July 1994. The defendant's mere suggestion at this point of "foul play" is nothing more than speculation, unsupported by any documentation in the record and, as a result, is rejected.

**No Toradol was found in Kemp's blood analysis:** Defendant contends that although 60 mg. of Toradol was administered to Kemp . . . the blood results for Kemp do not reveal the presence of Toradol. Thus, the defendant concludes that the blood analyzed by the FDLE "could not have been his (Kemp's) blood." Defendant contends that none of this evidence was known during the court proceedings. . . .

In his motion, the defendant notes that Kemp's emergency room record reflects that Toradol was administered. From this information, he reaches

- 6 -

the unwarranted conclusion that the FDLE Report shows that Kemp's blood "did not contain Toradol." This statement is inaccurate, misleading and unsupported. The FDLE Report indicates that Kemp's blood was tested only for the presence of [seven specific drugs]. The Report does not specify that Kemp's blood sample was tested for Toradol. Therefore, based on the evidence available, defendant cannot support the allegation that Kemp's blood conclusively contained no Toradol.

Finally, to the extent the defendant might believe that this lack of a finding of Toradol in Kemp's blood supports his "mixed-up" blood sample theory (in conjunction with his earlier incorrect contention that Kemp's blood alcohol level was "0"), his belief is misplaced. As noted above, defendant's admission of the consumption of alcohol on the night in question, coupled with the blood testing results from his won independently retained expert, support a finding of the presence of ethyl alcohol in his blood on the night of the fatal crash.

**Defendant has an expert to refute the State's blood alcohol level evidence:** Defendant alleges that his investigator spoke to a math professor who converted the results of his prior blood alcohol tests and that his results are far below the legal limit. Defendant contends that this evidence could have been used to refute the states expert, who purportedly would have testified and reconciled the difference in results between the state's test and the independent expert test performed by an expert appointed for the defendant.

The Court has reviewed the myriad of contentions raised by the defendant throughout his motion that he had "properly converted" his blood alcohol tests to show that his blood alcohol content was "significantly lower than the legal limit" on the night in question. The Court, however, has discovered one fatal flaw in the defendant's reasoning.

Defendant contends that "the State of Florida requires the blood results to be in *GRAMS per MILLILITERS.*" Herein lies the fatal flaw. Contrary to the defendant's assertion, blood alcohol results are *not based* on grams per milliliter. The plain and unambiguous language of section 316.1932, Florida Statutes, requires "The percent of alcohol in the blood shall be based upon *grams* of alcohol *per 100 milliliters* of blood. Hence, the Blake Medical Center report of defendant's blood alcohol level at .13 grams per deciliter (one deciliter = 100 milliliters) and the National Medical Services lab results of 60 milligrams per deciliter and 54 milligrams per deciliter, referred to numerous times in the prior proceedings in this case as the blood alcohol level of .054. Consequently, all of the defendant's alleged

> "proper conversions" are rendered erroneous, and his arguments based on these conversions are rendered moot.
>
> . . . .
>
> In fact, transcripts of prior proceedings in this case reveal that an expert had been retained by the defense for the purpose of performing independent tests of the defendant's blood samples and rendering testimony at trial. In the hearing on the motion to withdraw his plea, the defendant testified to the following: (1) he understood the focus at trial would have been on his blood alcohol level; (2) he knew his blood had been tested by the state and the state's tests revealed a result above the legal limit; (3) he knew his counsel had retained an independent expert to test his blood samples; (4) he knew the state had an expert to refute the independent lab results; and (5) he understood that he was giving up the right to argue this issue by entering his plea. Defendant's former counsel also testified that he felt the independent lab expert was not going to help the defense in light of the state's toxicology expert and he was also convinced that the "mixed-up" blood sample theory was not going to work. As a result of his discussions with the defendant and his family, he advised the defendant to enter a plea. Because rebuttal testimony was available to the defendant in 1995, the defendant's retention of a new expert now does not constitute new evidence.

Rodriguez presents nothing to challenge either the accuracy of the state court's findings that each of the allegedly newly discovered facts were discoverable through the exercise of due diligence or the state court's rejecting Rodriguez's claim that the newly discovered evidence proves his actual innocence. Rodriguez has not met his heavy burden. "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." House v. Bell, 126 S.Ct. at 2077. Rodriguez admitted to consuming at least a quart of beer before the accident, that he was driving the vehicle, and that he was driving recklessly. Change of Plea Transcript at 10, Respondent's Exhibit 1. None of the allegedly newly discovered facts would

- 8 -

cause a reasonable juror to have a reasonable doubt about Rodriguez's guilt. Consequently, Rodriguez cannot qualify for Schlup's gateway provision to allow review of the merits of his untimely grounds for relief.

Accordingly, Rodriguez's petition for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk shall enter a judgment against Rodriguez and close this action.

ORDERED in Tampa, Florida, on February 15, 2008.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE